**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

FEBRUARY 12, 2026

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
FEBRUARY 12, 2026

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| WANTHIDA CHANDRRUANGPHEN, | ) | |
| | ) | No. 103789-9 |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF SAMMAMISH, a municipal | ) | |
| corporation, | ) | |
| | ) | |
| | ) | Filed: <u>February 12, 2026</u> |
| Petitioner, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DANIEL BLOOM, | ) | |
| | ) | |
| Intervenor/Petitioner. | ) | |
| | ) | |

YU, J.[*] — This case concerns the statutory requirements for serving a

municipality with a Land Use Petition Act (LUPA) petition, ch. 36.70C RCW. At

issue is whether service on a nonstatutorily designated city employee strictly

complies with the applicable service statutes, and whether LUPA's three-day

---

[*] Justice Mary Yu is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

tolling provision that applies to "mailed" land use decisions also applies to decisions transmitted solely by e-mail.

The service statute designates specific individuals who may accept personal service on behalf of a municipality. RCW 4.28.080(2). In addition, LUPA sets strict timelines in which to accomplish service, with a three-day tolling provision applicable to land use decisions that are "mailed." RCW 36.70C.040(4)(a). We must interpret these provisions as applied to respondent Wanthida Chandrruangphen's attempts to serve petitioner city of Sammamish (City).

Chandrruangphen's first service attempt was within the statutory timeline, but she did not serve a statutorily designated individual. We hold this service attempt was improper because it did not comply with the plain language of the service statute, RCW 4.28.080(2). In her second attempt, Chandrruangphen served a statutorily authorized person, but she did so outside of LUPA's strict time limit. As expressly permitted by LUPA, the City's e-mailed decision was "not mailed." RCW 36.70C.040(4)(a). Thus, LUPA's three-day tolling provision for decisions that are "mailed" does not apply. Instead, LUPA's statute of limitations started running when the City's decision was "issued" via e-mail, which "provide[d] notice" that a written decision was "publicly available." *Id.* Therefore, we reverse and remand to the Court of Appeals to address the remaining arguments.

FACTUAL BACKGROUND

In August 2019, former property owner, Elizabeth Evans, filed a short plat alteration application with the City, seeking to remove a preexisting nonbuild restriction on her land. The plat notation attached to the land states that "[i]n order for Lot#2 & Lot[#]3 to be considered as a building lot, a revised short plat must be approved and recorded which provides sufficient evidence to demonstrate a reasonable building site." Clerk's Papers (CP) at 3 (capitalization omitted).

The Sammamish Development Code (SDC) specifies that the City is to "mail or provide written notice to the applicant that the application is either complete or incomplete." SDC 21.09.010(G)(1). In November 2019, the City notified Evans that her application was complete and that her established vesting[1] date was November 13, 2019. In this case, the record is silent as to whether the City sent its notice of completeness by mail or by some other means to Evans.

The City's letter to Evans explained that notice would be provided to the public and that, following a public comment period, the City would determine whether Evans's application was adequate to issue a recommendation. *See* SDC 21.09.010(H)(5)-(9) (outlining notice requirements for the public). However, if further information was deemed necessary, the City would notify Evans with a

---

[1] "Vesting" allows an applicant's land use application to be "considered under the zoning and . . . ordinances in effect on the date a complete application is filed." SDC 21.09.010(I)(1).

request for that information, and the application would not be processed until the materials were provided. *See, e.g.*, SDC 21.09.010(M)(1)(a)(i) (the City may require an applicant to "correct plans, perform required studies or provide additional information" after an application is deemed complete). The City further explained that after a 21-day comment period and once Evans's application was deemed adequate, it would prepare its recommendation. The underlying record indicates that the City issued its first review letter in January 2020, requesting additional information from Evans. However, there is no indication as to what occurred between January 2020, when Evans received this notice, and February 2021, when Evans sold the land to Wanthida Chandrruangphen.

According to Chandrruangphen, she acquired the property at issue from Evans in February 2021 and replaced Evans as the applicant for the land use application. Chandrruangphen acknowledges in her complaint that the City issued its first review letter in January 2020. However, the record does not indicate that Chandrruangphen took any action on the application after taking it over or that she attempted to communicate with the City.

Five months after Chandrruangphen purchased the land from Evans, she was notified by e-mail that the City was canceling her application for inactivity because she failed to submit the signatures of persons having an ownership interest in the land to be altered. She appealed the City's cancellation of her application, and in

August 2021 was notified by e-mail that her application had been revived and was under review. A few days after receiving notice of the revival of the application, Chandrruangphen alleges that she submitted the requested information.

Following the revival of the application, it appears there was a dispute between the City and Chandrruangphen regarding interpretations of applicable environmental municipal codes. The record indicates Chandrruangphen received four review letters over a two-year period from the City, seeking corrections to the application, studies, and formal code interpretations for any municipal codes she believed did not apply to the land.[2] Such code interpretations included (1) seeking to change the definition of what constitutes a landslide hazard area and (2) seeking to determine whether the proper setback of a stream buffer on an adjacent property is 50 feet, as Chandrruangphen submitted, or 75 feet, as the City's municipal codes require. The SDC explains that any modifications such as "[a]dditional encroachment into critical areas or buffers" requested by an applicant would constitute "a substantial change in a project's review requirements" and would be "deemed a new application." SDC 21.09.010(J)(3)(a), (2). Chandrruangphen concedes in her complaint that she did not submit any code interpretations, as the City requested.

---

[2] According to the City's cancellation letter, the dates on the issued review letters were October 19, 2021; March 7, 2022; June 24, 2022; and November 1, 2022. CP at 138.

In addition to requests for code interpretation, the review letters asked that Chandrruangphen provide information on the proposed home size for the land, provide responses to the issues raised by City consultants concerning a watershed site plan, and address the public works department's requirement for a right-of-way dedication that applies to private streets. Chandrruangphen was granted her last extension to submit these materials in December 2022, with six months to provide the requested information.

Six months after the last extension was granted, on May 8, 2023, the City sent an e-mail with an attached cancellation letter to Chandrruangphen and her attorney. It is undisputed that the City did not send its letter by mail. Additionally, the record does not indicate that Chandrruangphen or her attorney responded to this e-mail.

The SDC specifies that applications "may be canceled for inactivity" when an applicant fails to provide sufficient responses that address "code requirements identified in the written request for revision." SDC 21.09.010(M)(1)(a)(ii). In accordance with the SDC, the City canceled Chandrruangphen's application for failing to provide corrections and failing to seek administrative remedies after being given numerous extensions by the City to do so.

PROCEDURAL HISTORY

Sixteen days after the City e-mailed its cancellation letter, Chandrruangphen filed a LUPA petition against the City on May 24, 2023. On the same day, she hired a legal messenger to attempt service on the Sammamish city clerk. The process service slip provided by the legal messenger contains Chandrruangphen's instructions that service on the city clerk needed to be accomplished by May 30 (21 days from when the cancellation letter was e-mailed). According to a declaration provided by the city clerk, she was unavailable to receive service on May 24 as she was working from home that day. The record does not indicate if the city clerk was available to receive service for the remainder of the month, and there is no indication the process server attempted to make an appointment to accomplish service on the city clerk. The record also does not show any evidence of the city clerk attempting to evade service.

Two days later, on May 26, Chandrruangphen received the process server's declaration of service, which stated that the LUPA petition was personally handed to an office assistant who can receive service on behalf of the City. However, in a declaration provided by the office assistant, he explained that he works at the front desk of city hall and that he was not designated as an agent to the mayor or city manager to receive service on behalf of the City.

7

Because the declaration of service did not show the city clerk was served, Chandrruangphen's legal team called the city clerk to confirm receipt of the LUPA petition. It is undisputed that Chandrruangphen's attorney's paralegal spoke with the city clerk on May 26 and that the city clerk confirmed receipt of the petition. However, the city clerk and paralegal do dispute what was said during the call.

The paralegal states the city clerk confirmed service was sufficient, and she documented this exchange in an e-mail to assigned counsel. By contrast, the city clerk does not recall telling the paralegal that process was sufficient but states that she never considered that the service attempt was proper. Following this conversation between the paralegal and city clerk on May 26, a full business day remained before the May 30 deadline specified in Chandrruangphen's instructions to the process server. However, Chandrruangphen did not attempt service again until the following month.

Twenty-four days after the City e-mailed its cancellation letter, Chandrruangphen hired another process server to serve the city manager on June 1, 2023. It is undisputed that the city manager was personally served on June 1.

A month later, a neighboring property owner moved to intervene in the action, and the City moved to dismiss. The City argued dismissal was warranted because service on the office assistant was improper and service on the city

manager was untimely.[3] Chandrruangphen then moved for an initial LUPA hearing and requested the superior court enter an order in her favor as to all jurisdictional and procedural issues and set a schedule for trial.

On August 11, 2023, the superior court held a hearing to address each of the parties' motions. There is no record that Chandrruangphen requested an evidentiary hearing as to whether service on the city clerk was proper or that she attempted to depose the City's witnesses prior to oral argument.

After consideration of the parties' briefing, witness declarations, and oral argument, the superior court granted the motion to intervene and the City's motion to dismiss, ruling that it lacked jurisdiction to hear the petition as Chandrruangphen failed to properly comply with LUPA's strict service requirements. Chandrruangphen appealed.

In a published opinion, the Court of Appeals reversed and held that service on the city clerk was proper as "the process server set into motion the events that caused the documents to be served" on the city clerk. *Chandrruangphen v. City of Sammamish*, 32 Wn. App. 2d 527, 539, 556 P.3d 1137 (2024). As to the second service attempt, the appellate court interpreted LUPA to hold that "written" land

---

[3] The City also argued dismissal was warranted because its cancellation of the application was an interlocutory decision and not a final decision implicating LUPA review. CP at 77-78. The superior court disagreed. *Id.* at 240. The Court of Appeals also disagreed with the City's argument. *Chandrruangphen v. City of Sammamish*, 32 Wn. App. 2d 527, 533-34, 556 P.3d 1137 (2024). Because the City does not raise this argument on review before this court, we do not opine on whether a cancellation of a land use application constitutes a final land use decision.

use decisions, regardless of whether they are sent by mail or e-mail, are to be afforded a 3-day tolling of LUPA's statute of limitations. *Id.* at 538. Thus, the court held that service on the city manager, performed 24 days after the City's e-mail was sent, was considered timely. The appellate court reversed the dismissal order and remanded the case to the superior court for consideration of the LUPA petition. The City's motion for reconsideration was denied.

We granted the City's petition for review and accepted amicus memorandum from the Washington State Association of Municipal Attorneys (WSAMA).

## ISSUES

A.      Is service on a nonstatutorily designated city employee proper service on a municipality?

B.      Does LUPA's three-day tolling provision that applies to "mailed" land use decisions also apply to decisions solely transmitted by e-mail?

## ANALYSIS

In 1995, LUPA was enacted to provide for "the exclusive means of judicial review of land use decisions" made by local jurisdictions. RCW 36.70C.030(1). A "land use decision" is a final determination made by a local jurisdiction.[4] RCW

---

[4] As previously discussed, the applicability of LUPA was not raised before this court, and we will not opine on whether a cancellation of a land use application constitutes a final land use decision. *See supra* n.3.

36.70C.020(2)(a). Local jurisdictions include incorporated towns, counties, or cities. RCW 36.70C.020(3). The local jurisdiction in this case is a municipality.

LUPA's statutory purpose is to "establish[] uniform, expedited appeal procedures" that "provide consistent, predictable, and timely judicial review." RCW 36.70C.010. Thus, a LUPA petition must be timely served and timely filed to allow judicial review. RCW 36.70C.040(2). Our civil court rules govern these procedural requirements "to the extent that the rules are consistent with" LUPA. RCW 36.70C.030(2).

Within the context of LUPA, "a superior court acts in an appellate capacity" and cannot exercise its jurisdiction unless LUPA's service and filing requirements are satisfied. *Conom v. Snohomish County*, 155 Wn.2d 154, 157, 118 P.3d 344 (2005). A superior court that lacks appellate jurisdiction must dismiss a LUPA petition. *Id.*

Service of a LUPA petition on a municipality is governed by both LUPA and the service statute, RCW 4.28.080. Both statutes impose strict requirements for how service must be accomplished. LUPA requires that service on a municipality "be by delivery of a copy of the petition to the persons identified by or pursuant to RCW 4.28.080." Former RCW 36.70C.040(5) (LAWS OF 1995, ch.

11

347, § 705).[5]  The service statute specifies that "[s]ervice made in the modes

provided . . . is personal service."  RCW 4.28.080.  The statutory provision that

governs service on a municipality is RCW 4.28.080(2) and states that personal

service on a municipality must be made on one of the following persons: "the

mayor, city manager, or, during normal office hours, to the mayor's or city

manager's designated agent or the city clerk."

In addition to the strict requirements for how service must be accomplished,

LUPA requires a petitioner to adhere to a 21-day statute of limitations in timely

serving and filing a petition.  The 21-day limitations period begins to run on the

date a land use decision is issued.  RCW 36.70C.040(2), (3).  For the purposes of

LUPA, when a decision is "issued" depends on whether a decision is "written,"

"made by ordinance or resolution," or, if neither of those options applies, "the date

the decision is entered into the public record."  RCW 36.70C.040(4)(a)-(c).  It is

undisputed that the land use decision in this case is a "written" decision.

LUPA provides two mutually exclusive pathways for determining the date a

"written" decision is issued.  RCW 36.70C.040(4)(a).  A "written" decision issues

either "[t]hree days after a written decision is mailed by the local jurisdiction or, if

not mailed, the date on which the local jurisdiction provides notice that a written

---

[5] RCW 36.70C.040(5) was amended in 2024 to require service on the "office of a person" identified by statute, but it is undisputed that the former version applies in this case.

decision is publicly available." *Id.* In determining which pathway applies, the dispositive question is whether the decision was "mailed" or "not mailed." A written decision that is "mailed" is considered "issued" three days after it is sent. By contrast, LUPA expressly authorizes written decisions that are "not mailed," and the decision is considered "issued" on the date notice is provided that a "decision is publicly available." *Id.*

We review questions of statutory interpretation de novo. *Confederated Tribes & Bands of Yakama Nation v. Yakima County*, 195 Wn.2d 831, 837, 466 P.3d 762 (2020). When interpreting a statute, "[t]he court's fundamental objective is to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then the court must give effect to that plain meaning." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). Whether service was proper is a question of law we also review de novo. *Scanlan v. Townsend*, 181 Wn.2d 838, 847, 336 P.3d 1155 (2014). Chandrruangphen bears the initial burden to establish "a prima facie case" that service is proper. *Id.* If this burden is met, then the City must show by "clear and convincing evidence that the service was improper." *Id.*

In this case, Chandrruangphen's first attempted service on the City was improper because she did not accomplish service on an individual statutorily designated to receive service for the City. Additionally, her second service attempt

on the City was untimely because LUPA's three-day tolling provision does not apply to decisions transmitted solely by e-mail. Therefore, Chandrruangphen did not properly serve the City, and the trial court correctly dismissed her petition.

A.     Service on a municipality requires personal service on a statutorily designated individual

Chandrruangphen made two attempts to serve the City. It is undisputed that her first attempt was made within LUPA's 21-day statute of limitations. However, Chandrruangphen's first service attempt was on a nonstatutorily designated city employee. Our court must determine whether this service attempt complied with the applicable service statutes. Both service statutes expressly set out who must be personally served, and neither party argues that either of the applicable service statutes are ambiguous. Chandrruangphen did not meet her prima facie burden to show that she accomplished personal service on a statutorily designated person in her first service attempt. Therefore, we hold that Chandrruangphen's first service attempt did not adhere to the applicable service statutes and was improper service.

1.     The plain statutory language and relevant case law show that service on a municipality must be accomplished by personally serving one of the individuals designated by statute

The plain language of LUPA provides that Chandrruangphen was required to deliver the LUPA petition "*to the persons* identified by or pursuant to RCW 4.28.080." Former RCW 36.70C.040(5) (emphasis added). The service statute clearly specifies that service must be accomplished by "personal service." RCW

14

4.28.080(2) is the statutory provision governing service on a municipality, and it required Chandrruangphen to serve one of the following persons: (1) the city mayor, (2) the city manager, or (3) during normal business hours, a designated agent of either the city mayor or city manager, or (4) during normal business hours, the city clerk.

As indicated, the plain language of the service statute *does* provide a way to serve someone other than the statutorily authorized individuals, but *only* if that individual is a "designated agent" of the mayor or city manager. RCW 4.28.080(2). It is undisputed that the office assistant in this case was not a designated agent of either the city mayor or the city manager. Thus, by the statute's plain terms, service on a nondesignated city employee is improper service. When these applicable service statutes are read in conjunction, the plain language is clear: a LUPA petition must be personally served on an individual who is statutorily authorized or designated to receive service on behalf of the municipality.

Additionally, relevant case law, both pre- and post-LUPA, clearly demonstrates that Chandrruangphen was required to strictly comply with the applicable service statutes. For example, in *Witt v. Port of Olympia*, our Court of Appeals held that service on a part-time intern sitting at the front desk of the Port of Olympia was improper service on the port. 126 Wn. App. 752, 754, 109 P.3d

489 (2005). The court reasoned that the plaintiff failed to show the intern was "an office assistant to a person of authority" as required by former RCW 4.28.080(9) (LAWS OF 1997, ch. 380, § 1). *Id.* at 758 (emphasis omitted). Likewise, in *Overhulse Neighborhood Ass'n v. Thurston County*, the Court of Appeals held that service on a nonauthorized city employee instead of the county auditor, as required by the service statute, was improper. 94 Wn. App. 593, 597, 972 P.2d 470 (1999); *see* RCW 4.28.080(1). The court explained that "LUPA provides unequivocal directives," and the applicable service statutes "provide an unambiguous mandate that service must be on" a statutorily authorized person, which was the county auditor. *Overhulse,* 94 Wn. App. at 599, 601. Similarly, in *Meadowdale Neighborhood Committee v. City of Edmonds*, a pre-LUPA case, the Court of Appeals held that serving a mayor's secretary was not proper service on the City pursuant to RCW 4.28.080(2). 27 Wn. App. 261, 262, 616 P.2d 1257 (1980). The court reasoned that "[c]onfusion and uncertainty" is best "avoided by interpreting the statute according to its plain terms." *Id.* at 267.

Moreover, outside of the LUPA context, we recently reaffirmed in *Spencer v. Franklin Hills Health-Spokane, LLC* the importance of giving effect to the plain language of a specific statutory service provision. 3 Wn.3d 165, 548 P.3d 193 (2024). In *Spencer*, we considered whether a human resources (HR) manager can be considered a "managing agent" for purposes of personal service on a company

16

pursuant to former RCW 4.28.080(9) (LAWS OF 2015 ch. 51, § 2). *Id.* at 168. We acknowledged the service statute requires "personal service" and service "must be made to a person in a role enumerated in" the provision at issue. *Id.* at 170.

In looking at the persons named in the specific provision, we determined that the term "managing agent" is broad, and a person could be a managing agent if "they have substantial managerial responsibilities and authority to act on behalf of the corporation in general or with respect to an area of the corporation's business." *Id.* at 171, 175. Based on the record, we held that the HR manager's role within the company demonstrated they had "managing authority over the human resources department," and that it was reasonable to infer that they had authority to accept the summons and complaint on behalf of the company. *Id.* at 174.

However, the applicable statutory provision at issue in this case is distinguishable from the provision at issue in *Spencer*. In *Spencer*, our court's lengthy and detailed analysis focused on determining who might be considered a "managing agent" because the term is broad. By contrast, the provision at issue in Chandrruangphen's case uses narrow terminology that refers to specific, easily ascertainable individuals, while the provision in *Spencer* did not. Our analysis in this case is limited to specific persons authorized by statute to receive service on behalf of a municipality and would require only checking the City's website or

making a single phone call to verify who is authorized by statute or who has been designated as an agent by either the city mayor or the city manager.

Thus, based on the plain, narrow language of RCW 4.28.080(2), the office assistant needed to be a person either enumerated in the statutory provision or designated as an agent through the city mayor or city manager to receive service on behalf of the City. It is undisputed that the office assistant was a person neither statutorily authorized to receive service nor designated by another statutorily authorized city employee. Chandrruangphen's first service attempt was improper service on the City.

Nevertheless, despite the statutes' plain language, Chandrruangphen argues her service attempt on the city clerk was accomplished by so-called "secondhand service" through "hand-to-hand passing of documents from the original process server to the" office assistant who allegedly caused the LUPA petition to be in the possession of the city clerk. Suppl. Br. of Resp't at 28. She asserts that because this court previously approved a similar method of service in a case concerning individual parties, *Scanlan*, 181 Wn.2d 838, the same analysis "necessarily applies to service on a municipality under RCW 4.28.080." *Id.* at 29. However, the case Chandrruangphen relies on for support did not address service on municipalities or LUPA's strict service requirements, and the court cannot, in fact, apply the same analysis to service on municipalities that would apply to service on an individual.

2.      We decline to extend *Scanlan* to service on municipalities

Chandrruangphen contends that *Scanlan*'s holding should extend to her first service attempt on the City because, as she asserts, the applicable service statutes do not preclude a process server from serving a nonauthorized city employee who "either intentionally or unintentionally" provides the documents to the correct statutorily authorized person.  Suppl. Br. of Resp't at 29-30.  We reject her argument and decline to extend *Scanlan*'s holding to service on municipalities as such service would work to excuse a petitioner's noncompliance with the applicable service statutes and shift the burden to a municipality to ensure it serves itself.

In *Scanlan*, an individual plaintiff filed a personal injury action and hired a process server to serve an individual defendant.  181 Wn.2d 838.  The process server left the summons and complaint with the defendant's father, whom the defendant did not live with, but who later "delivered the summons and complaint to [the defendant] personally within the 90-day tolling period."  *Id.* at 846.  Our court was asked to consider whether this type of "direct, hand-to-hand—but 'secondhand'—service satisfies our state's service of process requirements."  *Id.* at 848-49.

Our analysis in *Scanlan* focused on the plain language of former RCW 4.28.080(15) (LAWS OF 2012, ch. 211, § 1), a type of catchall provision for cases

19

where no other specific provision applied. *Id.* at 847. This specific statutory provision required serving "the defendant personally" or "'leaving a copy of the summons at the house of his or her usual abode with some person of suitable age and discretion.'" *Id.* at 847 (quoting former RCW 4.28.080(15)). Because the service statute did "not say *who* has to do the service," we concluded that the statute allowed service to be accomplished by the defendant's father. *Id.* at 849. Our court's analysis then looked to the civil court rules and the evidence presented to the trial court to determine whether the father had, in fact, accomplished service.

In our review of the plain language of CR 4(c), we held that nothing prevented the father from serving the defendant because he was not a party to the suit, he was over the age of 18, and he was competent. Additionally, we held that the plaintiff had demonstrated a prima facie case of personal service on the defendant based on the defendant's own "testimony and her attorney's stipulation" that the father had personally served the defendant. *Id.* at 856.

Chandrruangphen's reliance on *Scanlan* is misplaced for a few reasons. First, our court's holding in *Scanlan* was based on an entirely different statutory provision of RCW 4.28.080 and considered entirely different language. Similar to our discussion of *Spencer*, the provision at issue in *Scanlan* used broad language, "which did not limit service to specific individuals and instead allowed for" a summons and complaint to be left "'with *some person*'" at the defendant's home.

20

Amicus Curiae Br. of WSAMA in Supp. of Pet'r at 7-8 (emphasis added) (quoting *Scanlan*, 181 Wn.2d at 847). Thus, unlike the specific, narrow terms used in the provision at issue in this case, the defendant's father in *Scanlan* qualified as "some person" who could serve the defendant.

As previously discussed, strict compliance is necessary when dealing with statutes that name specific persons who must be served in actions against municipalities. *See, e.g.*, *Overhulse*, 94 Wn. App. at 599-601; *Witt*, 126 Wn. App. at 758; *Meadowdale*, 27 Wn. App. at 262; *see also* 17 EUGENE McQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 49.36 (Supp. 2025). The applicable service statutes in this case, when read in conjunction, expressly designate which municipal persons are authorized to accept service on behalf of the City. The relevant provision in *Scanlan* did not have such an express designation.

Second, service on a municipality is not, and cannot be, the same as service on an individual. As amicus astutely explains, Chandrruangphen's proposed rule "[a]llowing secondhand service" on municipalities would "'open the door to a host of problems' when attempting to determine when and whether legally sufficient service occurred." Amicus Curiae Br. of WSAMA in Supp. of Pet'r at 5 (quoting *Meadowdale*, 27 Wn. App. at 267). Absent an explicit stipulation by the municipality that it was personally served, or testimony from the municipality

confirming such service occurred, the fact of service cannot be established with certainty, especially when service on its face is deficient.

The concurrence/dissent asserts that there is no reason to distinguish between service on individuals and service on municipalities, and that doing so will create "irrational inconsistencies." Concurrence/dissent (Mungia, J.) at 7; *see also* dissent (Johnson, J.). To the contrary, the plain language of RCW 4.28.080 *requires* this distinction by explicitly setting forth different service provisions for individuals and entities. There is nothing irrational about this distinction, as it properly avoids "[c]onfusion and uncertainty" in the commencement of an action against an entity. *Meadowdale*, 27 Wn. App. at 267. Moreover, "officers of a municipality . . . have only such powers and duties as are conferred upon them, expressly or by necessary implication, by applicable statutes." *Id.* at 267 n.4. Therefore, service on an entity, particularly a local government, "*must* be made to a person in a role enumerated in" the applicable statutory provision. *Spencer*, 3 Wn.3d at 170 (emphasis added); *see Overhulse*, 94 Wn. App. at 597; *Witt*, 126 Wn. App. at 758; *Meadowdale*, 27 Wn. App. at 262. Holding otherwise would turn any wrongfully served employee of the defendant into a process server for the plaintiff, contrary to the statute and long-established precedent governing service on municipal corporations.

Nevertheless, Chandrruangphen argues that a 2024 amendment to LUPA's service statute indicates a legislative "policy that favors ease of service on" municipalities. Suppl. Br. of Resp't at 33. The amended language now reads, "Service on the local jurisdiction must be by delivery of a copy of the petition to the ((persons)) office of a person identified by or pursuant to RCW 4.28.080 to receive service of process, or as otherwise designated by the local jurisdiction." RCW 36.70C.040(5) (LAWS OF 2024, ch. 347, § 12). However, it is undisputed that the 2024 amendment does not apply to the facts of this case. Yet, Chandrruangphen asks this court to extend *Scanlan*'s holding to service on municipalities to allow for ease of service. We decline to do so.

Contrary to Chandrruangphen's view, our court's objective in interpreting a statute "is to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then [we] must give effect to that plain meaning." *Campbell & Gwinn*, 146 Wn.2d at 9. In 1987, the legislature amended the service statute to include the "city manager, or, during normal office hours, to the mayor's or city manager's designated agent or the city clerk thereof" as persons who can accept service on behalf of the City. Former RCW 4.28.080(2) (LAWS OF 1987, ch. 361, § 1). This provision of the service statute made clear that the legislature intended for service on a municipality to be accomplished on these statutorily authorized individuals, the city mayor or city manager, or on individuals

23

designated by one of the statutorily authorized persons.  The legislature's intent is further supported by a bill report accompanying the 1987 amendment that stated "[p]ersonal service must be *made on the person designated by statute.  Leaving the summons in the designated person's office does not suffice.*"  FINAL LEGISLATIVE REPORT, 50th Leg., at 172-73 (Wash. 1987) (emphasis added), https://leg.wa.gov/media/0tqncjzf/1987-final-legislative-report-reg-and-sp-session.pdf.  Thus, the fact that the legislature amended LUPA's service statute in 2024 to authorize service on an individual's "office" strongly indicates that prior to the amendment, the statute required that personal service be made on a statutorily authorized individual.

The legislature's intent on how service was to be performed on a municipality is clear.  Thus, given the clear directives in the applicable service statutes, we decline to adopt Chandrruangphen's proposed rule that would allow so-called "secondhand service" on municipalities.

3.     Chandrruangphen did not meet her initial burden to show a prima facie case of proper service on the City in her first attempt

Chandrruangphen bears the initial burden to show a prima facie case of proper service.  *Scanlan*, 181 Wn.2d at 847.  If she meets her initial prima facie burden, then the City "must demonstrate by clear and convincing evidence that the service was improper."  *Id.*  Chandrruangphen "can establish service of process with an affidavit of service from a process server."  *Id.*  The "affidavit must state

the time, place, and manner of service." *Id.* at 848 (citing CR 4(g)(7)). She "can also establish proof of service by '[t]he written acceptance or admission of the [City], [its] agent[s] or attorney' of the time, place, and manner of service." *Id.* (first alteration in original) (quoting CR 4(g)(5), (7)). It is undisputed that the city clerk was not personally served by the process server.

Our review of the record shows that the superior court considered Chandrruangphen's motion for an initial LUPA hearing, the City's motion to dismiss based on improper service of process, and a third party's motion to intervene on August 11, 2023. It was at this hearing that Chandrruangphen had an opportunity to make her prima facie case. To demonstrate a prima facie case for proper service, she relied solely on the process server's declaration of service, her counsel's paralegal's declarations, and an e-mail sent from the paralegal to her counsel. However, Chandrruangphen provided no evidence that demonstrated the office assistant was a designated agent of the city able to receive service on its behalf. Additionally, the record contains no evidence showing *who* allegedly served the city clerk or *how* or *when* the petition was delivered to the city clerk.

However, the record does show that there was insufficient evidence that the office assistant was a designated agent. The process server's declaration of service states that the LUPA petition was handed to the office assistant. It is undisputed that the office assistant was not authorized to accept service on behalf of the City

25

and that the service statute provides for only the city mayor or city manager to designate another to receive service on behalf of the city, which they did not do. RCW 4.28.080(2). Additionally, the e-mails exchanged between Chandrruangphen's counsel's paralegal and the legal messenger contained no express mention of other city employees authorized or designated to receive service in place of the city clerk. Thus, as no such designation occurred, Chandrruangphen's service on the office assistant did not comply with the applicable service statutes, and she alone remained responsible for correcting this improper service attempt. *Scanlan*, 181 Wn.2d. at 856.

Nonetheless, Chandrruangphen argues that we should infer that the office assistant served the city clerk because the city clerk had the LUPA petition in her possession on May 26. Contrary to Chandrruangphen's interpretation of the record, there is no evidence that the office assistant personally delivered the petition into the hands of the city clerk. The record shows only that a conversation did occur between the city clerk and the paralegal. The record does not indicate that the paralegal directly quoted the city clerk, and there is nothing in the record showing there was communication in writing to or from the city clerk confirming that she stated service was sufficient. Instead, the record contains declarations from the city clerk stating that she did not consider or inform the paralegal that service was properly performed on the City through the office assistant. Thus,

26

Chandrruangphen's reliance on her counsel's paralegal's conversation with the city clerk does not amount to a prima facie showing of personal service on the city clerk because there was no evidence presented that would indicate how the documents were *actually* transmitted from the office assistant to the city clerk. The record also does not indicate that Chandrruangphen attempted to obtain such evidence through depositions or by requesting an evidentiary hearing, or by requesting a continuance to obtain additional evidence either prior to or at the hearing, despite having ample notice and appearing for the initial LUPA hearing.

Moreover, the record does not contain deposition testimony, an attorney stipulation, or a declaration by a statutorily authorized individual who can receive service on behalf of the City that would demonstrate "direct, hand-to-hand" delivery of the LUPA petition to the city clerk. *Scanlan*, 181 Wn.2d at 848. Over a two-month period, between the order setting the initial LUPA hearing and the actual hearing date, there is no indication Chandrruangphen attempted to depose the city clerk or the office assistant. *See* CR 26; CR 30. Thus, the superior court properly considered the City's motion to dismiss based on the declarations provided by the parties. As discussed, these declarations confirmed that the city clerk had the LUPA petition in her possession as early as May 26, but they did *not* state who gave her the petition, how it was given to her, or when precisely she received it.

The superior court found that Chandrruangphen "failed to establish by a preponderance that [the office assistant] was a person designated to receive service in place of the" city clerk, city manager, or city mayor.[6] CP at 238-39. Thus, given the record before the superior court, it properly determined that Chandrruangphen failed to satisfy her burden. Therefore, we hold that Chandrruangphen did not establish a prima facie case for proper service, and her first service attempt on the City was not properly accomplished according to the applicable service statutes because it was made on a nonstatutorily authorized city employee who was not designated to receive service on behalf of the City.

B.     LUPA's three-day tolling provision that applies to written land use decisions sent by mail does not apply to written decisions sent solely by e-mail

As stated previously, Chandrruangphen initiated two service attempts on the City. It is undisputed that the second service attempt was made on the city manager, a statutorily authorized person. It is also undisputed that Chandrruangphen's second service attempt on the city manager was completed on June 1, 2023. However, the parties do dispute the timeliness of this service. To

---

[6] As stated previously in this opinion and noted by the concurrence/dissent, Chandrruangphen's initial burden required only a *prima facie* showing of proper service, rather than a preponderance of the evidence. *See* concurrence/dissent (Mungia, J.) at 14. Nevertheless, because we hold that Chandrruangphen did not meet her initial prima facie burden, the trial court's reference to a "preponderance" was harmless.

determine whether this attempt was timely, we must interpret LUPA's statute of limitations, RCW 36.70C.040.

In computing LUPA's 21-day statute of limitations, the start date begins on the day a decision is issued to the applicant. RCW 36.70C.040(3). LUPA provides two mutually exclusive pathways for determining the date a "written" land use decision issues: either the decision is "mailed" or "not mailed." RCW 36.70C.040(4)(a). A decision that is "mailed" is considered "issued" three days after it is mailed. *Id.* A decision that is "not mailed" is considered "issued" on the date a municipality "provides notice" that the "decision is publicly available." *Id.*

Because LUPA expressly allows for written decisions to be "not mailed," we hold that written land use decisions sent solely by e-mail are considered "not mailed" and are considered issued on the day the e-mail is sent. Thus, the City's written cancellation letter sent by e-mail to Chandrruangphen is considered "not mailed" and "issued" on May 8, 2023, when it was transmitted. *Id.* The City's e-mail triggered LUPA's 21-day statute of limitations because it provided "notice" to Chandrruangphen that a decision was "publicly available." As a result, she had until May 30, 2023, to serve the City. *See* RCW 1.16.050(1)(e); CR 6(a). Service on the city manager was not accomplished until June 1. Therefore, we hold that Chandrruangphen's service attempt on the city manager was untimely.

1.    Relevant case law and civil court rules refer to the term "mail" as "postal matter"

For purposes of calculating the limitations period, LUPA divides written decisions into two categories: "mailed" and "not mailed."[7]  RCW 36.70C.040(4)(a).  The term "mailed" is not defined by LUPA.  When a term is not defined by statute, the "general rule" is to "presume the Legislature intended undefined words to mean what they did at common law."  *State v. Pacheco*, 125 Wn.2d 150, 154, 882 P.2d 183 (1994).  Our review of the relevant case law consistently shows that the term "mailed" refers only to "postal matter."  *Cont'l Sports Corp. v. Dep't of Lab. & Indus.*, 128 Wn.2d 594, 602, 910 P.2d 1284 (1996).

For example, in *Continental Sports Corp.*, our court considered whether a taxpayer's notice of appeal was timely filed when notice was sent by a private courier (Federal Express), but the statute required notice to be sent "'by mail or delivered in person.'"  *Id.* at 595, 597 (quoting RCW 51.48.131).  Because the relevant statute did not define the term "mail," our court analyzed the term according to its ordinary meaning.  *Id.* at 599.  We acknowledged that "resorting to

---

[7] The concurrence/dissent would hold the three-day tolling provision applies to all written LUPA decisions, regardless of whether they were mailed.  *See* concurrence/dissent (González, J.) at 5.  This interpretation improperly disregards the statute's explicit distinction between written decisions that are "mailed" and written decisions that are "not mailed," as well as the different civil rules governing service by "mail" and service by "electronic means."  CR 5(b)(2), (7).

the dictionary, unfortunately, is not particularly helpful" since the definitions could plausibly support either party's interpretation of mail. *Id.* In addition, we determined that no other Washington case had defined the term "mail." *Id.* at 600. However, we observed that the legislature was not always consistent across different statutes, sometimes requiring service by "mail" and other times requiring service "by 'United States mail.'" *Id.* at 600, 601.

Although the legislature required service by mail in some statutes and "service by 'United States mail'" in others, we reasoned that this fact "loses importance when one realizes that many statutes that use the term mail without a qualifier were adopted well before the use of private delivery companies to deliver postal matter became as common as it is today." *Id.* at 601. Thus, we were unwilling "to hold that mail is anything other than postal matter carried by the United States Postal Service." *Id.* at 602.

*Continental Sports Corp.* remains good law. It has not been rejected by legislative amendment, and its reasoning is persuasive within the context of LUPA because it provides historical recognition that the term "mail" has consistently been acknowledged as postal matter. Moreover, Chandrruangphen does not argue that *Continental Sports Corp.* should be disavowed. Instead, she argues that our court's decision in *Confederated Tribes* is more on point. 195 Wn.2d at 837; Resp't's

Resp. to Pet. for Rev. at 22. However, the legal issue before our court in *Confederated Tribes* was not the same legal issue that is presented in this case.

*Confederated Tribes* addressed whether, in calculating LUPA's 21-day limitation period, a written resolution should be treated as a "written" decision or a decision made by "resolution or ordinance by a legislative body sitting in a quasi-judicial capacity." 195 Wn.2d at 833 (citing RCW 36.70C.040(4)(a)-(b)). In this case, Yakima County issued its final decision by way of a resolution and transmitted it by e-mail and letter to Yakama Nation with the resolution attached. *Id.* at 834. Given that the local jurisdiction's code required final land use decisions to be "written," and the code's language used similar terms as the LUPA statute, we determined that the resolution was a "written" decision for LUPA purposes "under the circumstances of this case." *Id.* at 837. Thus, our court held that the decision at issue was a "written" decision for purposes of calculating LUPA's limitation period. *Id.* at 838.

Our court's reference to the county's chosen method of transmitting its land use decision by e-mail to Yakama Nation was not at issue in *Confederated Tribes*. Although we acknowledged that the county's written resolution was sent by e-mail, the county's chosen method of transmission was not the basis for our court's holding that RCW 36.70C.040(4)(a) was triggered. Instead, our court analyzed which portion of the LUPA statute applied to a written resolution "*under the*

*circumstances*" of that specific case. *Id.* at 837 (emphasis added). Given the county code's express use of the term "'written decision,'" we explained that it was the transmission of the written resolution that triggered RCW 36.70C.040(4)(a). *Id.* at 836. We further clarified within a footnote that neither party argued that a written decision sent by e-mail is afforded a three-day tolling of LUPA's statute of limitations. *Id.* at 836 n.2. We specifically explained that "[t]he county planner corresponded with Yakama through an e-mail containing a letter and the board's resolution. There is no dispute that this e-mail correspondence satisfies the 'mailing' requirement of RCW 36.70C.040(4)(a)." *Id.*

Unlike the parties in *Confederated Tribes*, the parties in this case *do* dispute whether LUPA's three-day tolling provision applies to e-mailed decisions. Despite our court's explanation in *Confederated Tribes* regarding the transmission of the decision by e-mail, Chandrruangphen relies on the footnote to argue that our court fully embraced the "consequences of equating email with mail" for the purposes of computing the 21-day service deadline. Resp't's Resp. to Pet. for Rev. at 21. However, as discussed, the footnote merely explains the parties' agreement that the local jurisdiction sent its written resolution by e-mail. Neither party requested that our court consider whether a "written" resolution should be considered "mailed" or "not mailed" for the purposes of calculating LUPA's 21-day deadline. RCW

33

36.70C.040(4)(a).  Thus, it is unreasonable to suggest that the footnote definitively resolved the issue now before this court or established a new legal principle.

Moreover, in addition to relevant case law recognizing the term "mail" consistently as "postal matter," our civil court rules also demonstrate the differences between service by mail, service by electronic mail, or service by other authorized means, such as facsimile.  For example, CR 5(b)(2)(A) specifies that when "service is made by mail, the papers shall be deposited in the post office . . . [and] shall be deemed complete upon the third day."  Similarly, CR 6(e) specifies that for the purposes of computing the statute of limitations, "3 days shall be added to the prescribed period" when service is made by mail.  By contrast, CR 5(b)(7) provides that other types of service, such as service by e-mail, is considered complete on the day it is transmitted.  Although the City was not required to formally serve Chandrruangphen in compliance with CR 5, the rule expressly recognizes the difference between postal matter and e-mail.  This is consistent with our precedent and with LUPA's plain language distinguishing between written decisions that are "mailed" and those that are "not mailed."

As previously stated, our civil court rules govern LUPA's service requirements "to the extent that the rules are consistent with" LUPA.  RCW 36.70C.030(2).  The court rules distinguishing between service by mail and service by e-mail are consistent with LUPA because LUPA requires notice to be given to

applicants, but it neither mandates a single method nor prohibits using e-mail. *See, e.g.*, RCW 36.70C.040(4)(a)-(c). The civil court rules provide recognized and reliable ways to effectuate notice, which aligns with LUPA's purpose of providing "consistent, predictable, and timely judicial review" of land use decisions. RCW 36.70C.010.

In accordance with relevant case law and our civil court rules, we hold that the plain meaning of the term "mailed," as used in RCW 36.70C.040(4)(a), does not include decisions sent solely by e-mail. Therefore, we further hold that the City's decision sent by e-mail was considered "not mailed." As a result, LUPA's 21-day limitations period started running when the City "provided notice" to Chandrruangphen that the decision was "publicly available."

2.     The City's e-mail triggered LUPA's 21-day statute of limitations as it provided notice to Chandrruangphen that a decision was publicly available

Since the City's decision was "not mailed," LUPA's 21-day statute of limitations started to run on "the date on which the local jurisdiction provides notice that a written decision is publicly available." RCW 36.70C.040(4)(a). The parties dispute whether the City's e-mail triggered LUPA's limitations period. We hold that it did.

The terms "notice" and "publicly available" are not defined by LUPA. However, we have previously interpreted this statutory language in *Habitat Watch*

*v. Skagit County*, 155 Wn.2d 397, 120 P.3d 56 (2005). In *Habitat Watch*, our court considered whether a group of citizens who opposed the construction of a golf course had timely filed their LUPA petition. Seven years after the county held its last public hearing on the golf course proposal, the citizens learned of the continued construction of the golf course and submitted a public records request to the county to determine who authorized the construction and when. *Id.* at 403. The citizens received the records on June 24, 2002, but did not file their petition until 36 days later, on July 31, 2002. The parties disputed when LUPA's clock started running for the purposes of the 21-day statute of limitations.

To determine which subsection of RCW 36.70C.040(4) controlled our analysis, we considered the possible interpretations of subsection (c) when a land use decision is "'entered' into the public record." *Id.* at 408. We formulated two possible interpretations: (1) that "subsection (c) is a catch-all provision that applies whenever the requirements for issuance under subsections (a) and (b) are not fulfilled" or (2) that subsection (c) "does not include decisions covered under subsections (a) and (b), but would include other types, such as decisions made orally at a city council meeting." *Id.* at 408 n.5. We determined that the "more likely" interpretation was the second interpretation, and "subsection (c) would not apply to this case because the decisions at issue were written." *Id.*

Thus, when the written decisions were issued by the county to the citizens in response to their public records request, we held that "the county had provided 'notice'" to the citizens "'that a written decision is publicly available' pursuant to RCW 36.70C.040(4)(a)." *Id.* at 409 (quoting RCW 36.70C.040(4)(a)). We further held that the citizens' "petition was time barred" because their petition was not filed until August 1, more than 21 days after the county completed the records request. *Id.*

Analogous to the citizens in *Habitat Watch*, the City's e-mail to Chandrruangphen is what "provided 'notice that a written decision is publicly available.'" *Id.* (quoting RCW 36.70C.040(4)(a)). Chandrruangphen received the City's e-mail on May 8, 2023, with the attached written decision, and she was provided "notice" that a decision on her application was "publicly available" and that she had 21 days to file a LUPA petition and serve the City. Moreover, LUPA does not require that a municipality's decision be issued to the public at large. Rather, LUPA requires that a decision be issued to the "persons who shall be parties to the review of the land use petition," which includes the "applicant for the permit" or "an owner of the property at issue." RCW 36.70C.040(2)(b)(i)-(ii).

Despite LUPA's explicit language authorizing written land use decisions that are "not mailed," Chandrruangphen argues the City was required to mail its decision in this case. In her view, if the City's e-mail does not qualify as "mail"

for purposes of the tolling provision, then LUPA's 21-day limitations period never started to run in the first place because the decision has not been made "'publicly available' under the City Code."[8]  Resp't's Resp. to Pet. for Rev. at 24 & n.47. Contrary to Chandrruangphen's view, the City's transmission of its decision via e-mail complied with the express language of LUPA, as discussed above, and was clearly permitted by the SDC.

According to the SDC's provision on permit decisions, land use applications "may be canceled for inactivity" when an applicant fails to provide sufficient responses that address "code requirements identified in the written request for revision.  Such cancellation due to inactivity is *not* a decision on the application made by the City."  SDC 21.09.010(M)(1)(a)(ii) (emphasis added).  In addition, the SDC's appeal procedures outline that the City is to provide notice to the applicant "of its final decision or recommendation on permits" as well as provide notice to the public.  SDC 21.09.010(L)(1).  The SDC states that "[n]otice shall be provided to the applicant," but the type of notice that is to be provided to applicants on final decisions is not outlined in SDC's procedures as it is for the public.  *Id.*

---

[8] The concurrence/dissent similarly argues the decision was not "publicly available" because the City "'did not provide the broad public notice.'"  Concurrence/dissent (González, J.) at 6 (quoting Pet'r's Suppl. Br. at 4).  This interpretation improperly conflates public *notice* with public *availability*.  As in *Habitat Watch*, the City's decision was available to any member of the public who requested it.  Chandrraungphen was notified of this public availability by the City's e-mail.  There is no requirement that the City must also notify the broader public in order to trigger LUPA's deadline as to Chandrruangphen.

In this case, it is undisputed that the City issued its completeness determination in November 2019 on Chandrruangphen's application and was permitted to do so by "mail[ing] or [by] provid[ing] written notice." SDC 21.09.010(G)(1). However, as previously discussed, following a two-year period in which the City provided several extensions, the City sent a written decision by e-mail explaining that Chandrruanghen's application "has been cancelled for inactivity and failure to resubmit all the requested information." CP at 140 (emphasis and boldface omitted). Since the City's code does not consider applications that are canceled due to inactivity as final decisions, it appears the City informs applicants of its decision to cancel an application for inactivity in the same way it informs applicants that an application is incomplete: by either mailing or providing written notice to the applicant. SDC 21.09.010(G)(5), (1). Thus, given that neither the SDC nor LUPA expressly state that land use decisions must be sent only by postal mail, the City was permitted to e-mail its decision canceling the application.

Accordingly, LUPA's 21-day statute of limitations began to run on May 8, when the City's e-mail provided Chandrruangphen notice that a written decision on her land use application was publicly available. As a result, service on the City was required to be accomplished by or before May 30. Therefore, the second attempt at service on June 1 was untimely.

CONCLUSION

We reverse the Court of Appeals because Chandrruangphen did not properly serve the City within LUPA's 21-day statute of limitations. The first attempted service, while timely, was not made on a statutorily designated person. The second service attempt on the city manager, while made on a statutorily designated person, was untimely. In accordance with RAP 13.7(b), we remand to the Court of Appeals to address the additional arguments it previously declined to reach. *Chandrruangphen*, 32 Wn. App. 2d at 543 n.8.

_____
Yu, J.P.T.

WE CONCUR:

_____
Stephens, C.J.

_____

_____
Montoya-Lewis, J.

_____
Madsen, J.

_____
Whitener, J.

_____       _____

No. 103789-9

GONZÁLEZ, J. (concurring in part and dissenting in part)—Our state has long

struggled with competing desires for and demands on the land we share.  *See* Land

Use Petition Act (LUPA), ch. 36.70C RCW; Growth Management Act (GMA), ch.

36.70A RCW; WASH. CONST. art. I, § 16.  As an example, concerns about

unplanned growth, wise use of land, and conservation led our state to adopt the

GMA, which requires local governments in populated areas to plan for growth and

property developers to develop within those plans.  RCW 36.70A.010.  Five years

later, concerns about inconsistent paths to judicial review, long wait periods, and

inconsistent standards for that review led our state to adopt the LUPA.  RCW

36.70C.010.

Washington law also vests considerable authority and responsibility to make

land use decisions in local governments.  *See* ch. 36.70B RCW.  But our

constitutional system also includes judicial review of local decisions. WASH.

CONST. art. IV, § 4.

A person seeking judicial review of a local land use decision must bring their petition promptly and properly. LUPA appeals (petitions) must be filed and served within 21 days of the local land use decision.[1] RCW 36.70C.040(3). This incredibly short time applies even to those who did not get individualized notice. *Samuel's Furniture, Inc. v. Dept. of Ecology*, 147 Wn.2d 440, 461-63, 54 P.3d 1194 (2002). However, LUPA petitioners effectively get an extra three days to file and serve their petitions in cases where the city issued a written decision by mail or provides notice that it is publicly available. RCW 36.70C.040(4). These time limits are strictly applied to those who appeal. *See Durland v. San Juan County*, 182 Wn.2d 55, 67, 340 P.3d 191 (2014). So too should the notice requirements be strictly applied to the government issuing the local land use decision.

Here, the city of Sammamish (City) neither mailed its written decision to Wanthida Chandrruangphen nor made the decision publicly available. Instead, the City e-mailed its decision to Chandrruangphen's attorney. Chandrruangphen filed and served her LUPA petition 24 days after the e-mail was sent, which is within

---

[1] LUPA does not specify to whom or how the notice is to be given.

the time allowed by RCW 36.70C.040(4). Because I would hold

Chandrruangphen's LUPA petition is timely, I respectfully dissent in part.

FACTS

Chandrruangphen acquired a plot of land and assumed the former owner's

application to remove a preexisting nonbuild restriction on the land.

After the City e-mailed its written decision canceling the land use

application due to inactivity to Chandrruangphen's attorney, Chandrruangphen

timely filed a LUPA petition.

Within 21 days after the City e-mailed its decision, Chandrruangphen made

the first service attempt of her LUPA petition on the City but did not serve a

statutorily designated person.[2]

Within 24 days after the City e-mailed its decision, Chandrruangphen made

a second service attempt of her LUPA petition on the City and served a statutorily

designated person.

The City successfully moved to dismiss Chandrruangphen's LUPA petition

based on improper and untimely service. The Court of Appeals reversed, holding

both service attempts were proper and timely. *Chandrruangphen v. City of

Sammamish*, 32 Wn. App. 2d 527, 556 P.3d 1137 (2024).

---

[2] The parties disagree over whether the City informed Chandrruangphen that this first service attempt was sufficient.

3

DISCUSSION

I agree with the majority that Chandrruangphen's first service attempt was improper because a statutorily designated person was not served and we require strict compliance. However, I disagree with the majority that Chandrruangphen's second service attempt was untimely.

A LUPA petition must be "filed and served . . . within 21 days of the issuance of the land use decision." RCW 36.70C.040(3). Importantly, however, LUPA provides how to calculate when a decision is issued based on the method of decision-making:

> For the purposes of this section, the date on which a land use decision is issued is:
> (a) *Three days after* a written decision is mailed by the local jurisdiction or, if not mailed, the date on which the local jurisdiction provides notice that a written decision is publicly available;
> (b) If the land use decision is made by ordinance or resolution by a legislative body sitting in a quasi-judicial capacity, the date the body passes the ordinance or resolution; or
> (c) If neither (a) nor (b) of this subsection applies, the date the decision is entered into the public record.

RCW 36.70C.040(4) (emphasis added). Here the City issued a written decision, therefore, subsection (a) applies, and an extra three days are added to the date of the City's issuance of its written decision. Under subsection (a), the City can start the appeal process in one of two ways: by mailing a written decision or providing notice that a written decision is publicly available. Under a strict application of the

4

law, unless we deem an e-mail to be the same as mail, the City here did neither. The City cannot establish it gave notice of a publicly available written decision when that decision was never made publicly available.

LUPA was enacted in 1995 to establish "uniform, expedited appeal procedures and uniform criteria" for reviewing local land use decisions and to ensure "consistent, predictable, and timely judicial review." RCW 36.70C.010. "[G]enerally, we have required parties to strictly adhere to procedural requirements that promote LUPA's stated purposes." *Durland*, 182 Wn.2d at 67. We should apply similarly strict treatment to the City's issuance of a written decision under RCW 36.70C.040(4)(a).

When LUPA was enacted, the legislature did not contemplate written decisions that would be e-mailed. Instead, the legislature determined that a LUPA petitioner would either receive a copy of the written decision in the mail or receive notice that the written decision is publicly available. *See* RCW 36.70C.040(4)(a). It is reasonable to conclude the legislature added three days to the issuance date of a written decision to give LUPA petitioners additional time to access that written decision after receiving notice that it is publicly available. Consequently, I see no reason to limit the three days of legislative grace to mailed decisions when it is equally plausible to read RCW 36.70C.040(4)(a) as also setting the issuance date as "[t]hree days after . . . the date on which the local jurisdiction provides notice

5

that a written decision is publicly available." Because the City issued a written

decision, Chandrruangphen's LUPA petition filed and served within 24 days was

timely.

Here, the Sammamish Development Code (SDC) allows the City to provide

notice of its land use decisions via mail, posting on the subject property, and

publication. SDC 21.09.010(H)(5). However, the City did not rely on any of these

methods of providing notice when it e-mailed its written decision to

Chandrruangphen; the City admits that it "did not provide the broad public

notice."[3] Pet'r's Suppl. Br. at 4.

We should follow the reasoning of *Confederated Tribes & Bands of Yakama*

*Nation v. Yakima County*, 195 Wn.2d 831, 466 P.3d 762 (2020). Specifically, that

decision's holding that LUPA's "stringent statutory deadlines . . . should not be so

woodenly interpreted as to prevent judicial review on the merits." *Id.* at 838. The

Court of Appeals faithfully applied that reasoning:

> Our Supreme Court unanimously held that the Yakama petition
> was timely pursuant to RCW 36.70C.040(4)(a), concluding that
> "Yakama filed its petition in superior court within 19 days of the
> county's mailing and within the 21-day filing period." *Confederated
> Tribes*, 195 Wn.2d at 840. The court employed the term "mailing"
> throughout the opinion, making no distinction between mail and e-mail.
> As noted by the court, "[t]here is no dispute that this e-mail
> correspondence satisfies the 'mailing' requirement of RCW

---

[3] I recognize that a cancellation due to inactivity is not a "decision" on the application under
SDC 21.09.010(M)(1)(a)(ii), but whether the cancellation was a final decision for purposes of
LUPA is not in dispute at this stage. *See* majority at 8 n.3.

6

> 36.70C.040(4)(a)." *Confederated Tribes*, 195 Wn.2d at 836 n.2. The message is clear: e-mail transmittal of a land use decision constitutes a mailing and, therefore, is governed by RCW 36.70C.040(4)(a). Thus, we hold that, for the purpose of obtaining LUPA review, a land use decision is "issued" 3 days after a written decision is e-mailed by the local jurisdiction.

*Chandrruangphen*, 32 Wn. App. 2d at 538 (alteration in original). Likewise, I would hold that an additional three days are added to the date of issuance because the City's written decision was e-mailed. The majority's technical interpretation of the word "mailed" leaves much to be desired.[4] However, even if I agreed with it, I would not conclude an e-mail of the written decision is notice that the decision is publicly available.

I disagree with the majority's decision to apply *Habitat Watch v. Skagit County* here because that would expansively interpret "notice" and "publicly available" to deny judicial review. 155 Wn.2d 397, 120 P.3d 56 (2005). I would limit *Habitat Watch*'s application to its unique facts. *Id.* at 406-07. The land use decisions in that case were permit extensions from years earlier, which the LUPA petitioners argued were void because there was no notice and opportunity to be

---

[4] The Superior Court Civil Rules governing service do not inform when the decision is "issued" under LUPA. *See* RCW 36.70C.040(4). I caution against reliance on the Civil Rules in circumstances where they would not apply.

Further, the City did not provide Chandrruangphen notice in compliance with the Superior Court Civil Rules. *See* RCW 36.70C.030(2). Under CR 5(b)(7), service by electronic means is available only when it is "consented to in writing by the person served or as authorized under local court rule." Chandrruangphen did not consent to receiving the written decision by e-mail.

heard; while the county had provided notice and a hearing for the initial permit

decision and the first extension, it "mistakenly failed to provide notice or a public

hearing for the second and third permit extensions." *Id.* at 400. This court

explicitly avoided answering when and the manner in which the land use decisions

were issued within the meaning of RCW 36.70C.040(4) because it was "not clear

from the record or the briefing" when they were issued. *Id.* at 408. Instead, this

court explained that in responding to the public records request, the county had

provided notice that a written decision was publicly available pursuant to RCW

36.70C.040(4)(a) "[b]y the date of the county's response." *Id.* at 409. Since the

LUPA petition was filed more than 21 days after "even . . . the last possible date"

under which the decision had been issued, the petition was untimely. *Id.* at 409

n.6. This case is unlike *Habitat Watch* in two important ways: First, the City's

written decision was e-mailed, not made available through a public records request.

Second, the 3 days of legislative grace for written decisions was not part of the

court's analysis. An e-mailed written decision, sent only to an applicant's attorney,

does not qualify as a "publicly available" decision.

I would hold by e-mailing the written decision, the City either "mailed" its

decision or did not provide adequate notice that its decision was publicly available.

Either way, Chandrruangphen's LUPA petition was timely because of the three

8

days of legislative grace for written decisions.  The majority's interpretation woodenly interprets the rules to prevent judicial review on the merits.

Accordingly, I respectfully concur in part and dissent in part.

González, J.
_____
González, J.

9

*Chandrruangphen v. City of Sammamish*

No. 103789-9

MUNGIA, J. (concurring/dissenting)—I agree with most of the majority's conclusions. Service under a Land Use Petition Act (LUPA) petition on a nonstatutorily designated city employee does not effect service of process. Ch. 36.70C RCW. There is not a three-day tolling period for a land use decision that is sent by e-mail. LUPA's time limits for effecting service are strictly enforced. However, I disagree with the majority's conclusion that the trial court properly dismissed the case for failure to effect service.

Here, the petitioner, Ms. Chandrruangphen, presented a prima facie case that she effected service on the City of Sammamish. The trial court properly held a hearing to determine whether service had been effected. However, the trial court improperly placed the burden of proof on Ms. Chandrruangphen to prove that service had been accomplished. That was error. Instead, the City had the burden of demonstrating by clear and convincing evidence that service had not been accomplished. The City did not meet that burden. Accordingly, I dissent to that portion of the majority's opinion.

I.    SERVICE OF PROCESS REQUIREMENTS MUST BE STRICTLY FOLLOWED BUT WE WILL NOT ADD ADDITIONAL REQUIREMENTS THAT ARE NOT SPECIFIED IN THE RULES

This appeal raises two principles governing whether a party has effected service of process in a LUPA action:

1.    We will strictly enforce the rules as to who must be served and the time limits for that service.

2.    We will not add requirements to those service rules.

Both principles must be followed.

This appeal involves the issue of whether Ms. Chandrruangphen effected service of process. Ms. Chandrruangphen had 21 days to serve her LUPA petition after the City issued a land use decision.[1]  RCW 36.70C.040(2), (3).  Service involves two actors: (1) the person being served and (2) the person doing the serving.

Regarding who could be served in a LUPA action, at the time of this case, service could be made on a municipality through personal service on the mayor, city manager, or, during office hours, on the mayor's or city manager's designated agent or the city clerk. Former RCW 36.70C.040(5) (LAWS OF 1995, ch. 347, § 705); RCW 4.28.080(2).

On the other side of the equation, as to who could do the serving, CR 4(c) controls:

> **By Whom Served.**  Service of summons and process . . . shall be by . . . any person over 18 years of age who is competent to be a witness in the action, other than a party.

---

[1] I also agree with the majority that whether a cancellation of a land use application constitutes a final land use decision is not before us.

CR 4(c) provides very few restrictions on who is eligible to serve the process. All that is required is that someone—over the age of 18, not a party, and competent to testify—hands the process to the defendant.

The following are the key facts for this appeal:

- On May 8, 2023, the City e-mailed the cancellation letter to Ms. Chandrruangphen and her attorney.

- Ms. Chandrruangphen had until May 29, 2023, to file and serve her LUPA petition.

- On May 24, Ms. Chandrruangphen's process server served Julian Bravo, an Office Assistant II. Mr. Bravo was not authorized to accept service.

- Lita Hachey, the city clerk, received the LUPA petition.[2]

- On June 1, 2023, Scott MacColl, the city manager, was served with the petition. This service was after the May 30 deadline.

Here, Ms. Chandrruangphen made a prima facie showing that she effected service on the City. *Scanlan v. Townsend*, 181 Wn.2d 838, 847, 336 P.3d 1155 (2014). The City then had the burden of demonstrating by clear and convincing evidence that service was not effected. *Id.* The majority not only improperly places the burden of proof on Ms. Chandrruangphen but it also compounds that error by holding that even if Mr. Bravo

---

[2] The County's attorney, at the motion hearing, told the trial court that documents were "eventually put in the hands of the City clerk." Mot. Hr'g at 26.

had handed the documents to Ms. Hackey, personal service would not have been effected even though Mr. Bravo was over 18, competent to testify, and not a party to the action. However, nothing more is required by the service rules. Accordingly, I dissent.

## II.   SERVICE WAS PROPER UNDER LUPA

The majority confuses LUPA's strict requirement as to who can accept service with the court rule as to who can serve the petition.

Former RCW 36.70C.040(5) set forth the requirements for serving local jurisdictions for a LUPA action:

> Service on the local jurisdiction must be by delivery of a copy of the petition to the persons identified by or pursuant to RCW 4.28.080 to receive service of process.

RCW 4.28.080(2) then identifies the individuals authorized to accept service of process for a city:

> Service made in the modes provided in this section is personal service. The summons shall be served by delivering a copy thereof, as follows:
>
> . . . .
>
> (2) If against any town or incorporated city in the state, to the mayor, city manager, or, during normal office hours, to the mayor's or city manager's designated agent or the city clerk thereof.

In contrast, while the statutes impose strict requirements as to who can accept service, there are no corresponding requirements as to who can serve a petition. When a statute does not limit who can serve process, CR 4(c) provides the requirements. *Scanlan*, 181 Wn.2d at 847. Under CR 4(c), the only restrictions on who can serve

process are that the person is over the age of 18, is competent to be a witness, and is not a party. Courts cannot add additional limits to CR 4(c). *Id.* at 849. We have affirmed that

> "[n]othing in the rule requires that a process server have a contractual obligation to serve process. CR 4(c). Nor is there any requirement of proof of intent to serve process. CR 4(c). And we find nothing that would prohibit a person who comes into possession of a summons and complaint by defective service from being a competent process server. CR 4(c)."

*Id.* at 851 (quoting *Brown-Edwards v. Powell*, 144 Wn. App. 109, 111-12, 182 P.3d 441 (2008)). In short, any qualified person can personally serve a party through direct, hand-to-hand service, even if they do so unintentionally. *Id.* at 848-50.

In *Scanlan*, we held service was effected when a process server handed a copy of the summons and complaint to the defendant's father followed by the father handing the copy to the defendant. *Id.* at 841-46. We held the father served process on the defendant because the father met the CR 4(c) requirements, even if he did not intend to serve the summons and complaint. *Id.*

The reasoning we used in *Scanlan* applies here. There, we noted that "RCW 4.28.080(15) lists specific prerequisites to personal service, but it does not say *who* has to do the service." *Id.* at 849. Similarly, here, while former RCW 36.70C.040(5) and RCW 4.28.080(2) list specific requisites for personal service, they do not specify who must do the service. LUPA does not limit who can serve a LUPA petition. Therefore, anyone who is competent to serve process under CR 4(c) can serve a LUPA petition.

Despite the clear language of CR 4(c), the majority impermissibly adds requirements to the rule. The majority gives two rationales—neither of which are convincing.

1. *The majority reasons that* Scanlan *involved a different statutory provision*

The majority asserts that *Scanlan* does not apply in the LUPA context because "*Scanlan* was based on an entirely different statutory provision of RCW 4.28.080 and considered entirely different language." Majority at 20. That is inaccurate.

The majority is correct that *Scanlan* involved a different subsection of RCW 4.28.080 than is involved in this dispute. However, the focus of this appeal is who can properly effect the service. The people who could receive service in *Scanlan* were the defendant and someone of suitable age who lived at the defendant's usual abode. The people who could receive service here included the city clerk. But that does not address the issue of who may serve the process. Both in *Scanlan* and here the statute is silent on who may serve process. As such, CR 4(c) sets the requirements. The requirements as to who may serve the process are the same here as they were in *Scanlan*.

A petitioner in a LUPA action must serve an individual just like any other plaintiff in any other action. The LUPA statute identifies who that individual can be. This is no different than statutes designating who can be served in any other type of action. For example, in a civil action against an individual, service can be effected on the defendant or on an adult who lives at the defendant's place of usual residence. RCW 4.28.080(14). If the defendant is an insurance company, then its authorized agent must be served.

RCW 4.28.080(6). Statutes identify the specific individuals authorized to accept service. However, the only requirements for the person serving the process are that they are over 18, not a party, and are competent to testify. CR 4(c).

2. *The majority opines that a host of problems would occur*

The majority's second basis upholding its reasoning is its assertion that "service on a municipality is not, and cannot be, the same as service on an individual." Majority at 21.

First, service on a municipality entails personal service on an individual. Serving a municipality requires serving a person, whether that person is the mayor, city clerk, or another authorized individual. So in fact, personally serving a LUPA petition on a municipality is no different than personally serving any other individual.

Second, the majority claims that there will be a "host of problems" if someone other than the paid process server hands the documents to the authorized recipient. *Id.* However, any potential problem would be no different than any potential problem found in the *Scanlan* setting. Instead, under the majority's added gloss to CR 4(c), there will now be irrational inconsistencies as to when service will be deemed effective. A few hypothetical examples illustrate the anomalies that could now exist under the majority's conclusion.

The *Scanlan* scenario

Paid process server Pat knocks on the door where defendant Danny lives. A person, Alex, who appears to Pat to be an adult, opens the door. Pat asks Alex whether

they live there, and they say yes. Pat then hands Alex the documents. Alex later that day hands the documents to Danny, not knowing that the documents are a summons and complaint.

Under *Scanlan*, we held that this is effective service. In the customary case where the process server hands the summons and complaint to the defendant, the process server files a declaration with the court, detailing who was served. That declaration provides the prima facie case that service was effected. The defendant can always dispute the accuracy of the declaration. To succeed, the defendant must prove by clear and convincing evidence that the service of process was ineffective.

Under *Scanlan*, a second step is involved. In order to prevail, the defendant must show that they were not handed the summons and complaint. The fact that someone other than the original process server handed the documents to the defendant will not make the service ineffective. The fact that the person handing the documents to the defendant did not know what the documents were will not make the service ineffective. CR 4(c) imposes no such requirements.

Yet the majority is imposing additional unstated requirements. The majority does not explicitly state that it believes that the original paid process server must be the one who hands the documents to the authorized recipient. Yet under the majority's reasoning, that would be the logical outcome. But such an outcome would go squarely against our holding in *Scanlan*. Moreover, such an outcome would also go against our principle that we will not add requirements to the service rules.

The following hypothetical illustrations demonstrate the inconsistencies that could arise under the majority's reasoning. Each of these scenarios would satisfy the requirements of *Scanlan* and CR 4(c). Yet, the majority's holding casts doubt on whether service would be proper.

Example A

Paid process server Pat timely hands Carol, the city clerk, a copy of the LUPA petition. Pat is over 18 years old, not a party to the action, and is competent to testify in court.

Example B

Paid process server Pat gets ready to enter the municipal building, slips, and breaks her leg. Frank, a friend of Pat, sees what happens and rushes to Pat. Pat asks Frank to take the LUPA petition to the clerk's office and hand it to Carol, the city clerk. Frank is over 18 years old, not a party to the action, and is competent to testify in court. Frank hands the petition to Carol.

Example C

Paid process server Pat, while entering the municipal building, slips and breaks her leg. Stranger Sam rushes over to Pat and asks whether she can help. Pat asks Sam if she will take these documents and hand deliver them to the city clerk. Sam goes to the clerk's office and hands the documents to Carol, the city clerk. Stranger Sam does not know what the documents are.

Example D

Paid process server Pat, while entering the municipal building, slips on the floor and breaks her leg. Assistant to the city clerk Annie rushes over to Pat and asks whether she can help. Pat asks Annie if she will take the LUPA petition and hand deliver it to the city clerk. Annie goes to the clerk's office and hands the documents to the city clerk. Annie is over 18 years old, not a party to the action, and is competent to testify in court. Annie does not know what the documents are.

Example E

Paid process server Pat goes to the clerk's office and timely hands a copy of the LUPA petition to Annie, the assistant to the city clerk. Annie is over 18 years old, not a party to the action, and competent to testify in court. Annie does not know what the documents are. Annie hand delivers the documents to the city clerk.

Example F

Paid process server Pat goes to the city clerk's office and timely hands a copy of the LUPA petition to Annie, the assistant to the city clerk. Annie is over 18 years old, not a party to the action, and is competent to testify in court. Annie knows that the documents are a LUPA petition. Annie hand delivers the documents to Carol, the city clerk.

Under *Scanlan*, service would have been effected in all six scenarios. In all six scenarios, the requirements of CR 4(c) were met. Nonetheless, under the majority's holding, service is not effected in Example F (the current situation) and at least some, if

not all, of the other scenarios.  However, by so holding, the majority violates the principle

that we will not add additional requirements to the service rules.  *Scanlan*, 181 Wn.2d at

849 ("[W]e will not add additional limits on who can effect service onto the limits

contained in CR 4(c).").

III.    MS. CHANDRRUANGPHEN MADE A PRIMA FACIE CASE THAT SHE EFFECTED SERVICE

Ms. Chandrruangphen had the burden of making a prima facie showing that

service was proper.  *Id.* at 847.  A prima facie showing would be sufficient evidence on

its own that would demonstrate that she complied with the service requirements.  *Id.* at

847-48, 856.  While a declaration of service is the norm, it is not required to establish a

prima facie case.  *Id.*  For instance, we have affirmed that the defendant's admission "'is

the best possible evidence that [they] received the summons and complaint.'"  *Id.* at 856

(quoting *Hamill v. Brooks*, 32 Wn. App. 150, 151-52, 646 P.2d 151 (1982)).

In order to make a prima facie showing of effective service, Ms. Chandrruangphen

needed to show that someone 18 years or older, competent, and not a party, handed the

city clerk the LUPA petition by May 30.  Ms. Chandrruangphen did that.

Ms. Chandrruangphen submitted to the trial court a declaration of service signed

by the process server where the process server testified to the following:

> That on 5/24/2023 at 1:25 PM at the address of 801 228th Ave SE,
> Sammamish, within King County, WA 98075, the undersigned duly served
> the following documents(s): Summons on Land Use Petition and Complaint
> for Damages . . . in the above entitled action upon City of Sammamish c/o
> City Clerk, by then and there personally delivering 1 true and correct set(s)
> of the above documents into the hands of and leaving same with Julian

11

> Brave [sic], Office Assistant II, who is authorized to accept service on
> behalf of the above.

Clerk's Papers (CP) at 25.

Ms. Chandrruangphen, by submitting this declaration, made a prima facie case that

she had effected service on the City.

The majority combines a plaintiff's burden of making a prima facie case of

effective service with the second step of a contested issue as to service: the defendant's

burden to show that service was not effective. However, once a plaintiff makes a prima

facie case that service was effective, then the defendant has the burden to establish by

clear and convincing evidence that service of process was not effective. *Scanlan*, 181

Wn.2d at 847. The trial court must hold an evidentiary hearing to make that

determination. *Harvey v. Obermeit*, 163 Wn. App. 311, 327, 261 P.3d 671 (2011).

Here, the trial court held a hearing on August 11, 2023. Mot. Hr'g at 1. The

following is the evidence submitted by the parties.

Ms. Chandrruangphen submitted a declaration dated July 31, 2023, by Benita

Lamp, a paralegal at her attorney's law firm. Ms. Lamp testified:

> I contacted Lita Hachey via phone on May 26, 2023 at 12:19 p.m. and left a
> voicemail for her to call back. She returned my call on May 26, 2023 at
> approximately 12:24 p.m. and she confirmed that the process service was
> sufficient. She explained that she had received the pleadings, signed off on
> them and gave them to Cynthia Schaff who is the City of Sammamish's
> Hearing Examiner's Clerk. These dates and times are taken from my cell
> phone log. I also documented this information in contemporaneous email.
> *See* Exhibit C.

CP at 117.

Exhibit C to Ms. Lamp's declaration was an e-mail dated May 26, 2023, to Ms. Chandrruangphen's attorney. Ms. Lamp wrote:

> Lita [Hachey] called back and she said she received the pleadings, signed off on them and gave them to Cynthia Schaff who is the HE clerk now. She said process service was sufficient.

CP at 124.

Ms. Hachey filed a declaration with the trial court. Ms. Hachey testified that she did have a telephone call with Ms. Lamp on May 26, 2023. CP at 227. Regarding Ms. Lamp's testimony that Ms. Hachey told her that service of process was sufficient, Ms. Hachey testified:

> 4. I do not recall telling Ms. Lamp that the "process was sufficient," as described in Paragraph 5 of her declaration.
>
> . . . .
>
> 6. I have never stated, nor have I ever considered, that the May 24, 2023, service attempt was valid and consistent with personal service as required by RCW 4.28.080(2), which provides: "Summons, how served: . . (2) If against any town or incorporated city in the state, to the mayor, city manager, or, during normal office hours, to the mayor's or city manager's designated agent or the city clerk thereof."
>
> 7. At no point was I ever personally served the LUPA Petition and Summons by the Petitioner, Petitioner's Counsel, or the Petitioner's Agent.

CP at 227-28.

The attorney for the City, at the hearing before the trial court, admitted that someone put the LUPA petition into the hands of the city clerk:

> You've heard a lot of dispute about whether, in fact, it's sufficient process to just simply leave those documents with the front desk at City Hall as opposed to personally serve them on the City clerk, City manager,

13

or Mayor.  And it is true that they were left there and then eventually put in the hands of the City clerk, who initialled it and moved it forward for processing.

Mot. Hr'g at 26.

The trial court ruled in favor of the City.  CP at 237.  The trial court ruled it was Ms. Chandrruangphen's burden to prove that service was effective.  That was an error of law.  Ms. Chandrruangphen had the burden of making a prima facie case of effective service of process.  She had done that.  Once she had made her prima facie case, it was then the City's burden to prove by clear and convincing evidence that process was not effective.

We review the trial court's conclusion of law that process was not effective de novo.  *Scanlan*, 181 Wn.2d at 847.

Here, the City failed to show by clear and convincing evidence that the LUPA petition was not effectively served.  The City could have presented testimony that no one had handed Ms. Hachey the petition.  However, it failed to present such evidence.  Ms. Hachey did not testify that Mr. Bravo did not hand her the documents.  Ms. Hachey did not testify that no one handed her the documents before May 30, 2023.  Ms. Hachey did not testify that she did not tell Ms. Lamp that service of process had been effected when they spoke on May 26.

Because Ms. Chandrruangphen met her initial burden of presenting a prima facie case that she effected service of process, the burden then moved to the City to show by

clear and convincing evidence that service was ineffective. The record shows that the City failed to meet that burden.

IV.    CONCLUSION

There are two parts to service of process: (1) who is the individual authorized to accept service and (2) who may serve the process. The two are distinct and must not be combined. Who may accept service of process does not affect who may serve the process.

This appeal involves who may serve the process in a LUPA action. CR 4(c)'s only restrictions on who may serve the process are that they are 18 years or older, are competent to testify in court, and are not a party. Otherwise, anyone can serve a LUPA petition.

There is no requirement under CR 4(c) that the process server be paid nor is there any requirement under CR 4(c) that the person serving the process intended to accomplish that goal.

Once a plaintiff makes a prima facie case that service of process has been effected, then the burden shifts to the defendant to demonstrate by clear and convincing evidence that service was not effective.

Here, Ms. Chandrruangphen made a prima facie showing that she effected service of process. The trial court held an evidentiary hearing. The trial court applied an incorrect legal standard imposing the burden of proof on Ms. Chandrruangphen to prove that service of process was effected. Instead, it was the City's burden to prove by clear

15

and convincing evidence that service of process had not been effected. The City failed to do that.

I would affirm the Court of Appeals' decision and reverse the trial court's dismissal of the lawsuit.


_____
Mungia, J.

_____
Gordon McCloud, J.

*Chandrruangphen v. City of Sammamish*

No. 103789-9

JOHNSON, J. (dissenting)—While I respect the majority's careful analysis in this case, I dissent because I would take a different approach to conclude that the city clerk was timely and adequately served. RCW 36.70C.040 states that service on a local jurisdiction must be done pursuant to RCW 4.28.080. The latter statute specifies only the appropriate individual to serve when the action involves a city. RCW 4.28.080(2). It does not include anything about who must do the serving. CR 4(c) provides the relevant server requirements, which states that "any person over 18 years of age who is competent to be a witness in the action, other than a party" can serve process.

In *Scanlan v. Townsend*, 181 Wn.2d 838, 336 P.3d 1155 (2014),[1] we stated that the defendant has the burden to show by clear and convincing evidence that service was improper after the plaintiff establishes sufficient service. We held that service complied with RCW 4.28.080 and CR 4 when the plaintiff gave the summons and complaint to the defendant's father because the father then properly

---

[1] *Scanlan* is applicable here, even though it is not a Land Use Petition Act case. Ch. 36.70C RCW. This is because no relevant statute in either case limits who can serve process beyond the restrictions of CR 4(c).

1

served the defendant.

Similarly, here, the process server delivered the Land Use Petition Act petition to an assistant. The record shows that the city clerk had the petition in hand within the 21-day limitations period. From this, Ms. Chandrruangphen shows sufficient service because it shows whoever handed the petition to the clerk, whether it was the assistant or someone else, served the city clerk. Because the city did not present evidence showing clear and convincing evidence that service was improper, I would hold that the service here complied with the relevant statutory and court rule requirements. On this basis, the Court of Appeals should be affirmed.

_____
Johnson, J.